IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF ARKANSAS
JONESBORO DIVISION


KAREN DENISE ASH                                              PLAINTIFF


v.                            NO. 3:17-cv-00016 PSH


NANCY A. BERRYHILL, Acting Commissioner                DEFENDANT
of the Social Security Administration


MEMORANDUM OPINION AND ORDER


Plaintiff Karen Denise Ash ("Ash") began this case by filing a complaint pursuant to 42 U.S.C. 405(g). In the complaint, she challenged the final decision of the Acting Commissioner of the Social Security Administration ("Commissioner"), a decision based upon findings made by an Administrative Law Judge ("ALJ").

Ash maintains that the ALJ's findings are not supported by substantial evidence on the record as a whole.[1] It is Ash's contention that her residual functional capacity was not properly assessed, and she offers two reasons why. She first maintains that the ALJ failed to give proper weight to the opinions of Dr. Roger Cagle, M.D., ("Cagle"), Ash's treating physician. Second, Ash maintains that the ALJ failed to give proper weight to the opinions contained in a mental diagnostic evaluation and intellectual assessment performed by Dr. Dennis Vowell, Psy.D., ("Vowell"). Because it is unclear why the ALJ weighed the opinions as he did, the Court finds that a remand is warranted.

---

[1]      The question for the Court is whether the ALJ's findings are supported by substantial evidence on the record as a whole. "Substantial evidence means less than a preponderance but enough that a reasonable person would find it adequate to support the decision." See Boettcher v. Astrue, 652 F.3d 860, 863 (8th Cir. 2011).

The ALJ is required to assess the claimant's residual functional capacity, which is a determination of "the most a person can do despite that person's limitations." See Brown v. Barnhart, 390 F.3d 535, 538-39 (8th Cir. 2004). The assessment is made using all of the relevant evidence in the record, but the assessment must be supported by some medical evidence. See Wildman v. Astrue, 596 F.3d 959 (8th Cir. 2010). In making the assessment, the ALJ is required to consider the medical opinions in the record. See Wagner v. Astrue, 499 F.3d 842 (8th Cir. 2007). A treating physician's medical opinions are given controlling weight if they are well-supported by medically acceptable clinical and laboratory diagnostic techniques and are not inconsistent with the other substantial evidence. See Choate v. Barnhart, 457 F.3d 865 (8th Cir. 2006). The ALJ may discount a treating physician's medical opinions if other medical assessments are supported by better or more thorough medical evidence or where the treating physician renders inconsistent opinions that undermine the credibility of his opinions. See Id.

Ash alleged in her applications for disability insurance benefits and supplemental security income payments that she became disabled beginning on June 26, 2010, although she later amended her onset date to June 6, 2012. She alleged that she became disabled as a result of impairments that included chronic back pain; migraine headaches; osteoarthritis in her hands, feet, and other joints; depression; and an intellectual disability. She ably summarized the evidence in the record, see Document 10 at CM/ECF 2-14, and the Commissioner did not challenge the summary or otherwise place it in dispute. The Court accepts the summary as a fair summation of the evidence. The summary will not be reproduced, save to note several matters germane to the issues raised in the parties' briefs.

On November 18, 2010, Ash was seen by Vowell for a mental diagnostic evaluation and intellectual assessment in connection with a prior claim for benefits. See Transcript at 504-510. Ash described her overall mood as depressed. She reported being sad most days and described feelings of hopelessness and helplessness. She additionally reported "difficulty with reading comprehension." See Transcript at 504. She reported being previously diagnosed with a learning disability and having taken remedial classes in school. She also reported a history of chronic back pain and chronic headaches.

Vowell noted that Ash had no history of mental health treatment. Ash had never been prescribed medication for her mental health issues, and she had never been hospitalized for any such issues. She identified "financial problems as an obstacle to treatment." See Transcript at 505.

Vowell also recorded Ash's personal and employment history. Ash reported that she obtained a high school diploma but was enrolled in resource classes beginning in elementary school for help with math and reading. She last worked in June of 2010 at a Family Dollar store where she served as an assistant manager. She quit the job because she was not allowed time off to visit with her daughter. Ash reported no difficulty interacting appropriately with her peers and supervisors.

Vowell administered Wechsler Adult Intelligence Scale-Fourth Edition ("WAIS-IV") testing, and Ash's scores included a full scale IQ score of fifty-seven. The score placed her within the range of one mildly mentally retarded. Vowell believed Ash to have put forth her best effort and believed the score to be a valid assessment of her intellectual functioning.

Vowell diagnosed a dysthymic disorder and mild mental retardation. With respect to the effects of Ash's mental impairments on her adaptive functioning, Vowell opined the following:

> A. How do mental impairments interfere with this person's day to day [a]daptive functioning? ...
>
> Claimant is capable of driving unfamiliar routes but currently does not have a vehicle. She is capable of shopping independently and manages her own finances. She is able to complete basic household chores and basic ADL's [i.e., activities of daily living].
>
> B. Capacity to communicate and interact in a socially adequate manner? ...
>
> Claimant appeared capable of adequate and socially appropriate communication and interaction in today's session.
>
> C. Capacity to cope with the typical mental/cognitive demands of basic work-like tasks?
>
> The [c]laimant appeared to sustain a reasonable degree of cognitive efficiently and was able to track and respond to various kinds of questions and tasks without remarkable slowing or distractibility.
>
> D. Ability to attend and sustain concentration on basic tasks?
>
> As noted in the findings of the mental status exam, the claimant displayed mild to moderate difficulty responding adequately to basic assessment of attention and concentration capacity.
>
> E. Capacity to sustain persistence in completing tasks?
>
> Persistence appeared adequate throughout the session.
>
> F. Capacity to complete work-like tasks within an acceptable time frame?
>
> The claimant did not display remarkable psychomotor slowing. In terms of mental status type tasks, capacity to perform within a basically acceptable time frame was demonstrated.

See Transcript at 508.

On January 15, 2014, Ash began seeing Cagle for complaints that included low back pain and depression. See Transcript at 393-397. She reported that she had not seen a physician in years and was taking no medication. A physical examination revealed nothing remarkable. Cagle diagnosed a depressive disorder, anxiety, insomnia, and irritable bowel syndrome. He prescribed medication for her impairments.

Ash thereafter saw Cagle on what appears to have been twenty-four occasions. See Transcript at 398-400 (02/15/2014); 401-402 (04/09/2014); 403-404 (05/09/2014); 405-406 (06/12/2014); 407-409 (09/05/2014); 410-412 (10/06/2014); 413-415 (11/12/2014); 416-418 (12/15/2014); 419-421, 433-435 (01/15/2015); 436-438 (02/13/2015); 439-441 (03/13/2015); 442-444 (04/14/2015); 486-488 (05/12/2015); 483-485 (05/27/2015); 480-482 (06/16/2015); 500-502 (07/16/2015); 497-499 (08/17/2015); 494-496 (09/18/2015); 490-493 (10/19/2015); 536-538 (11/13/2015); 20-22 (05/16/2016); 17-19 (06/16/2016); 14-16 (07/15/2016); 11-13 (08/16/2016). The progress notes reflect that he continued her on medication for her impairments and treated her for additional impairments that included headaches, chest pain, lumbago/low back pain, osteoarthritis in her hands, and pain in her knee.

On January 18, 2016, Cagle signed a medical source statement-physical on behalf of Ash. See Transcript at 551-552. He opined, inter alia, that she could lift and carry ten pounds occasionally and less than ten pounds frequently, could stand and walk for about four hours during an eight hour workday but could not stand and walk for more than thirty minutes at one time, and could sit for about six hours during an eight hour workday but could not sit for more than two hours at one time. He opined that she required frequent breaks and a sit/stand option.

On January 18, 2016, Cagle also signed a medical source statement-mental on behalf of Ash. See Transcript at 554-555. He opined that she had a number of marked limitations, e.g., in her ability to understand and remember detailed instructions, in her ability to carry out detailed instructions, in her ability to sustain an ordinary routine without special supervision, and in her ability to complete a normal work-day and work week without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods. Cagle also opined that Ash had a number of moderate limitations.[2] He opined that her impairments and/or treatment would cause her to be absent from work more than three days each month.

On November 1, 2016, Cagle signed a "To Whom It May Concern" letter on behalf of Ash. In the letter, he represented that "… [Ash] complains of increasing back pain that radiates down in her hips. [She] has multiple health issues and she is not physically or mentally able to work." See Transcript at 9.

On May 13, 2015, Ash sought treatment at Families, Inc., a mental health facility. See Transcript at 478. The progress note from the visit contains minimal findings. It reflects that Ashley Withrow, a licensed clinical social worker, diagnosed Ash with a recurrent, major depressive disorder and a generalized anxiety disorder.

During the course of treating Ash, Cagle referred Ash to Comprehensive Pain Specialists ("CPS") for treatment of her back pain. See Transcript at 544. Ash first presented to CPS on October 28, 2015, at which time she reported the following:

---

[2]    Cagle represented that Ash had moderate limitations in every area encompassed by the medical source statement-mental, specifically, understanding and memory, sustaining concentration and persistence, social interaction, and adaptation.

> ... She [complains of] pain when normal activity doing chores and can't stand on her feet for very long. She had [an] x-ray about 2 months ago at her [primary care physician's] office. She has had pain for several years that has progressively gotten worse. She has never had a MRI of her lumbar. She did [physical therapy] for four weeks and didn't get much relief. She is currently taking Tramadol for pain and this helps somewhat but doesn't control it. ...

See Transcript at 544. Amy Deatherage ("Deatherage"), a nurse practitioner, observed that Ash was experiencing headaches and had pain in her neck, shoulders, back, and knees. Deatherage observed that the pain was exacerbated by lifting and carrying heavy loads and by bending and stooping, and the pain interfered with Ash's ability to perform her daily chores. Deatherage did observe, though, that Ash had a normal range of motion in her extremities. Deatherage diagnosed, inter alia, low back pain and prescribed medication, ordered an MRI, and recommended lumbar facet injections.

On November 3, 2015, Ash underwent an MRI of her lumbar spine. See Transcript at 529-534. The results of the MRI revealed mild disc desiccation at L3-L4, L4-L5, and L5-S1 but no disc herniation or spinal stenosis.

On January 5, 2016, Ash was seen at CPS by Dr. Jeffrey Hall, M.D., ("Hall"). See Transcript at 540-543. He administered lumbar facet injections at L1, L2, and L3 and refilled her pain medication.

Ash was subsequently seen at CPS on what appears to have been five occasions. See Transcript 557, 574-576 (01/19/2016); 559-560, 569-573 (02/04/2016); 586-590 (03/01/2016); 583-585 (04/12/2016); 580-582 (04/26/2016). The progress notes reflect that she received several additional rounds of injections and was continued on pain medication. She eventually reported some relief from her back pain as she reported an improvement in her functioning and activities of daily living.

Ash's medical records were reviewed by state agency medical professionals.  <u>See</u> Transcript at 70-82, 83-95, 105, 109. With respect to her physical limitations, they opined that she had no physical restrictions. With respect to her mental limitations, they opined that she was capable of performing unskilled work.

Ash completed a series of documents in connection with her applications. <u>See</u> Transcript at 226-233, 240-241, 242-250, 252. In the documents, she represented that she can attend to her personal care, prepare her own meals, and perform some household chores. She spends time with others and enjoys "skyping" with her daughter. Ash has difficulty, though, finishing what she starts and has difficulty following spoken instructions.

Maddie Akes ("Akes"), Ash's mother, submitted a letter on behalf of Ash. <u>See</u> Transcript at 303. In the letter, Akes represented that she assists Ash with most of her daily activities. Akes represented that she does so because Ash has difficulty standing for long periods of time. Akes additionally represented that Ash "stays most of her time in bed." <u>See</u> Transcript at 303.

Ash testified during the administrative hearing. <u>See</u> Transcript at 49-63. She was born on February 3, 1973, and was forty-three years old at the time of the hearing. She has a high school education. She lives by herself, can shop for groceries, and can drive an automobile. She occasionally socializes with her neighbor. Ash previously worked at a Family Dollar store but required help performing her job duties. She continues to experience back and feet problems, and the problems prevent her walking or sitting for more than thirty minutes at one time. The problems also prevent her from working a job that would allow a sit/stand option.

The ALJ found at step two that Ash has severe impairments in the form of "lumbar degenerative disc disease, sacrococcygeal disorder, an affective disorder, and anxiety." See Transcript at 33. The ALJ assessed Ash's residual functional capacity and found the following:

> … the claimant has the residual functional capacity to lift and carry 20 pounds occasionally and 10 pounds frequently. The claimant can stand or walk six hours in an eight-hour workday. The claimant can sit for six hours in an eight-hour workday. The claimant can push or pull 20 pounds occasionally and 10 pounds frequently. The claimant can understand, remember, and carry out simple work instructions. The claimant can make judgments in simple work-related situations. The claimant can respond appropriately with co-workers and supervisors, and minor changes in the usual work routine. The claimant should not have to interact with the general public.

See Transcript at 34. In making the foregoing findings, the ALJ noted that Cagle's opinions regarding Ash's physical limitations were "consistent with the evidence of record" but only gave the opinions "some weight." See Transcript at 37. With respect to Ash's mental limitations, the ALJ gave "substantial weight" to the state agency medical professionals' opinions. See Transcript at 37. The ALJ noted that Cagle's opinions regarding Ash's mental limitations were "consistent with the evidence of record" but only gave the opinions "some weight." See Transcript at 37. The ALJ recited Vowell's opinions regarding Ash's mental limitations but does not appear to have given the opinions any weight. The ALJ found at step four that Ash cannot return to her past work but found at step five that there is other work she can perform.

Ash first maintains that the ALJ failed to give proper weight to Cagle's opinions. Ash so maintains, in part, because the ALJ found that although the opinions were "consistent with the evidence of record," the ALJ only gave them "some weight."

"In deciding whether a claimant is disabled, the ALJ considers medical opinions along with 'the rest of the relevant evidence' in the record." See Wagner v. Astrue, 499 F.3d at 848 [quoting 20 C.F.R. 404.1527(b)]. "[W]hether the ALJ grants a treating physician's opinion[s] substantial or little weight, the regulations … provide that the ALJ must 'always give good reasons' for the particular weight given to a treating physician's evaluation." See Singh v. Apfel, 222 F.3d 448, 452 (8th Cir. 2000) [quoting 20 C.F.R. 404. 1527(d)(2)].

It is undeniable that Cagle was a treating physician. His opinions regarding Ash's physical limitations were therefore entitled to considerable, if not controlling, weight if they were well-supported by medically acceptable clinical and laboratory diagnostic techniques and were not inconsistent with the other substantial evidence. The ALJ found that Cagle's opinions were "consistent with the evidence of record," which suggests that the opinions would be given considerable weight. The ALJ did not give the opinions such weight. Instead, the ALJ only gave the opinions "some weight," which indicates that he discounted the opinions. The ALJ failed, though, to provide a reason for discounting the opinions.

The Commissioner offers several reasons why the ALJ may have discounted Cagle's opinions regarding Ash's physical limitations, e.g., the opinions were conclusory and inconsistent with the evidence. The task of assigning weight to medical opinions, and the task of offering reasons for discounting the opinions, is for the ALJ. Given the confusion created by the ALJ's conflicting findings regarding Ash's physical limitations, a remand is warranted so that the ALJ can explain his reasons for weighing the opinions as he did and, if necessary, send Ash for a consultative physical examination.

Ash also maintains that proper weight was not given to the opinions of her mental limitations, specifically, that proper weight was not given to Cagle's opinions in the medical source statement-mental and to Vowell's opinions in the mental diagnostic evaluation and intellectual assessment. Ash's contention is not particularly compelling with respect to Vowell's opinions because they were offered approximately nineteen months before the amended onset date. The ALJ's treatment of Cagle's opinions, though, is suspect because the ALJ failed to give a reason for discounting them. There is evidence that Ash has mental impairments, and the limitations caused by the impairments may not be fully accounted for in the assessment of her residual functional capacity. Upon remand, the ALJ shall re-evaluate the opinions of Ash's mental limitations and, if necessary, send Ash for a consultative mental examination.

Substantial evidence on the record as a whole therefore does not support the ALJ's assessment of Ash's residual functional capacity. A remand is necessary. Upon remand, the ALJ shall explain his reasons for weighing the medical opinions as he did and, if necessary, send Ash for a consultative physical and mental examination.

The Commissioner's decision is reversed, and this case is remanded. The remand in this case is a "sentence four" remand as that phrase is defined in 42 U.S.C. 405(g) and Melkonyan v. Sullivan, 501 U.S. 89 (1991). Judgment will be entered for Ash.

IT IS SO ORDERED this 11th day of July, 2017.

_____
UNITED STATES MAGISTRATE JUDGE